# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Anthony and Deborah Carunchio, | : | |
| William and Lisa Feehery, Jim | : | |
| Anderson, Mark and Lisa O'Brien, | : | |
| Tam Heckel, John and Kay Coldiron, | : | |
| and Joanna and Jarrod Barton, | : | |
| Appellants | : | |
| | : | |
| v. | : | No. 1379 C.D. 2017 |
| | : | Argued: June 10, 2020 |
| Swarthmore Borough Council | : | |
| and Headstrong Foundation | : | |

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
                  HONORABLE P. KEVIN BROBSON, Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge
                  HONORABLE ELLEN CEISLER, Judge
                  HONORABLE J. ANDREW CROMPTON, Judge

**OPINION BY JUDGE BROBSON**          **FILED:  August 11, 2020**

Anthony and Deborah Carunchio, William and Lisa Feehery, Jim Anderson, Mark and Lisa O'Brien, Tam Heckel, John and Kay Coldiron, and Joanna and Jarrod Barton (Appellants) appeal from an order of the Court of Common Pleas of Delaware County (Common Pleas), dated August 31, 2017.  Common Pleas affirmed the decision of the Swarthmore Borough Council (Borough Council), which approved Headstrong Foundation's (Headstrong) request for an accommodation (Accommodation Request) under the Fair Housing Amendments Act of 1988 (FHAA).[1]  For the reasons set forth below, we affirm.

---

[1] 42 U.S.C. §§ 3601-3631.

## I. BACKGROUND

Headstrong is the equitable owner of real property (Property) located at 200 South Chester Road in the Borough of Swarthmore (Borough), Delaware County, near the intersection of South Chester Road and Harvard Avenue. The Property, upon which sits a residence containing 7 bedrooms and 2½ bathrooms, is located in the RB Residential Zoning District (RB District). Headstrong intends to use the Property to "provide temporary housing for cancer patients who are undergoing treatment at Philadelphia area hospitals and treatment facilities and their caregivers." (Reproduced Record (R.R.) at 396a.) Section 1248.02 of the Borough's Codified Ordinances (Ordinance) permits single-family dwellings in the RB District. Section 1240.05(36) of the Ordinance defines "dwelling" as "a building or portion of a building used for human habitation by a family." Section 1240.05(37) of the Ordinance defines a "single-family dwelling" as "a building designed and occupied exclusively as a residence for one family on one lot." A single family can include "[n]ot more than three unrelated persons occupying a dwelling unit, living together." Section 1240.05(43)(c) of the Ordinance.

On August 2, 2016, Headstrong filed its Accommodation Request with the Borough's Accommodation Request Review Board (Review Board), seeking an accommodation under the FHAA to revise the Ordinance's definition of "family" to include "up to [7] unrelated cancer patients and their caregivers." (R.R. at 397a.) Headstrong alleged that the people who would be using the Property "are physically disabled and requir[e] specialized medical treatment," which meets the definition of "handicapped" under the FHAA. (*Id.* at 397a.) The Review Board held hearings on Headstrong's Accommodation Request and, by order dated September 13, 2016,

2

approved the Accommodation Request.  Appellants appealed the Review Board's order to Borough Council, which conducted a *de novo* hearing.

At the hearing, Headstrong presented the testimony of Cheryl Collelouri, Headstrong's President.  (*Id.* at 48a.)  Ms. Collelouri testified that Headstrong is a non-profit organization that provides direct services to improve the lives of people affected by cancer.  (*Id.* at 49a.)  One of those services is a complimentary long-term housing facility for cancer patients and their families located in Ridley Township called "Nick's House."  (*Id.* at 49a-50a, 69a.)  Ms. Collelouri stated that cancer patients who are forced to travel from their homes to receive treatment at nearby cancer facilities are permitted to stay at Nick's House with 1 caregiver. (*Id.* at 52a-53a.)  Headstrong accommodates those patients as referrals from the social work network, the American Cancer Society, the Leukemia and Lymphoma Society, and/or medical teams from the University of Pennsylvania Medical Center (Penn Medicine) or the Children's Hospital of Philadelphia (CHOP).  (*Id.* at 58a.)

Ms. Collelouri also testified that a typical stay at Nick's House is 6 to 8 weeks, but patients have stayed for as short as 4 weeks and as long as 6 months.  (*Id.* at 52a.) Nick's House, which sleeps 8 people, has served 67 families in the 5 years since it opened its doors.  (*Id.* at 49a-50a, 69a.)  There have never been any calls for emergency services at Nick's House.  (*Id.* at 57a.)  Ms. Collelouri explained that, through Nick's House, Headstrong "become[s] an extension of [a patient's] family" and a support system and provides patients and their families "with the comforts of home, a place to stay, a place to shower, a place to unwind, [and] a place to rest and recover."  (*Id.* at 59a-60a.)  Headstrong also provides patients/caregivers staying at Nick's House with emotional support and assistance with hospice arrangements, if needed.  (*Id.* at 59a.)  Headstrong does not, however, provide food/meals, laundry

3

services, or medical services to the patients/caregivers staying at Nick's House. (*Id.* at 60a-61a, 79a, 86a.) Ms. Collelouri testified further that while Headstrong provides cleaning services for the common areas, the patients and their caregivers are responsible for cleaning their rooms and tidying up after themselves. (*Id.* at 86a.) Ms. Collelouri also testified that each of the bedrooms at Nick's House contains a safe and a coded door lock. (*Id.* at 77a-78a.)

Ms. Collelouri indicated that Headstrong is prepared to purchase the Property to be used as an extension of Nick's House. (*Id.* at 57a-62a.) She explained that Headstrong plans to add an additional bathroom to the Property that is handicapped accessible. (*Id.* at 63a.) Ms. Collelouri also explained that the bedrooms at the Property will each sleep 4 people. (*Id.* at 75a-76a.) The maximum number of people staying at the Property at any given time, however, would be limited to 14. (*Id.* at 76a.) Patients/caregivers staying at the Property would be limited to 1 vehicle, and, therefore, the maximum number of patient/caregiver vehicles at the Property would be 7. (*Id.* at 53a-54a.) Headstrong anticipates having 2 representatives/staff members present at the Property to address the needs of the families, as well as other service providers on an occasional basis—*e.g.*, cleaning persons, repair persons, and landscapers. (*Id.* at 55a-56a, 81a-83a.) Ms. Collelouri estimated that an average of 10 vehicles would be present at the Property at any given time. (*Id.* at 56a-57a, 63a.) The plan for the Property includes 11 parking spaces. (*Id.* at 63a-64a.) Although she admitted that guests would be permitted to visit the Property, which could increase the number of vehicles at the Property, Ms. Collelouri indicated that there has only ever been 1 visitor/guest at Nick's House due to the distance from home that the patients/caregivers travel to receive treatment. (*Id.* at 71a-74a, 85a.) Ms. Collelouri

4

also explained that Headstrong does not expect the Borough to provide any services other than general municipal services—*i.e.*, trash removal. (*Id.* at 66a.)

Headstrong also presented the testimony of Pam Dutton, the caregiver/grandmother of a cancer patient, who, at the time of the November 1, 2016 hearing, was residing at Nick's House. (*Id.* at 14a, 21a.) Ms. Dutton testified that her grandson received a bone marrow transplant at CHOP, which required him to stay in the Philadelphia area for 100 days post-transplant. (*Id.* at 14a-15a.) Ms. Dutton testified further that, after being in a hospital for 44 days, it was nice for her grandson to be in a home environment with his own room where he could spread out. (*Id.* at 17a-18a.) Ms. Dutton explained that they used the kitchen for several meals, but they also brought food in from local restaurants. (*Id.* at 18a.) Ms. Dutton explained further that Nick's House is "almost like a little home. Our home here has other components to it. We have the staff that is there to help us so we can get what we need, and [with] a hotel room, you would not have that at all." (*Id.* at 19a.) Ms. Dutton admitted that there were no other patients or caregivers staying at Nick's House other than her and her grandson.[2] (*Id.* at 22a.)

Headstrong also presented the testimony of Vukan R. Vuchic, a transportation engineer who is also a member of the Borough's Planning Commission and who heard testimony and rendered a decision in this matter at the Review Board level. (*Id.* at 26a, 35a.) Dr. Vuchic[3] testified that a full-scale traffic study of South Chester Road at the intersection of Harvard Avenue was not necessary

---

[2] Ms. Collelouri explained that Ms. Dutton and her grandson were the only patients/caregivers staying at Nick's House because Ms. Dutton's grandson's immune system was compromised due to his treatment. (*Id.* at 69a-70a.)

[3] While the nature of the witness's doctorate has not been explained, we will refer to the witness as "Dr. Vuchic" to be consistent with the hearing transcript.

because the impact that the accommodation will have on traffic will not be large. (*Id.* at 32a-34a.) Dr. Vuchic explained that South Chester Road is very busy, with a daily average vehicle count of 11,000 vehicles, and the Property's "proposed use would generate somewhere between 20 and 30 trips per day." (*Id.* at 29a, 33a.) Dr. Vuchic explained further that those 20 to 30 trips, which he categorized as medical trips to a hospital, "would not be [as] highly peaked" as other traffic because people would be coming and going from the Property at different times. (*Id.* at 33a, 41a-43a.) Dr. Vuchic opined that the traffic increase associated with the accommodation "is not that great." (*Id.* at 34a.) Dr. Vuchic admitted, however, that there are problems with traffic on Harvard Avenue at times. (*Id.* at 43a-44a.)

Headstrong also presented the testimony of Jane Billings, the Borough's Manager, Zoning Officer, and Code Enforcement Officer. (*Id.* at 89a, 96a.) Ms. Billings testified that the Property is located in the RB District, which is "basically thought of as a single-family residential." (*Id.* at 90a.) Ms. Billings explained that the areas surrounding the Property are zoned RB Residential, RC Residential, and Institutional and include such things as the Swarthmore Presbyterian Church, the Swarthmore Community Center, Swarthmore College dorms, a shared drive, a parking lot, houses, and two large apartment buildings. (*Id.* at 90a-93a, 98a-100a.) Ms. Billings indicated that the Ordinance does not require that a house located in the RB District be occupied for a certain length of time to be considered a "dwelling." (*Id.* at 94a-95a.) Ms. Billings explained that Borough Council has even "taken the position in the last [6] months that [bed and breakfasts] are allowed [in the RB District] as long as they are not violating the [3] unrelated persons rule." (*Id.* at 94a.) Ms. Billings confirmed that there is nothing in the Ordinance's definition of "family" that requires that a family eat meals

6

together or addresses whether a family can have locks on their bedroom doors. (*Id.* at 95a.) Ms. Billings explained that there is no zoning district within the Borough that permits more than 3 unrelated persons to live in 1 dwelling. (*Id.* at 101a-02a.) As the Borough Manager, Ms. Billings has not received any complaints about the traffic on Harvard Avenue. (*Id.* at 104a.)

Headstrong also presented the testimony of Stephanie Fooks-Parker, an oncology social worker at CHOP. (*Id.* at 105a.) Ms. Fooks-Parker testified that her job duties include working with local housing providers to secure housing for her patients and their families in the Philadelphia area. (*Id.* at 106a.) She decides which patients to send to the different types of housing based on factors such as location, cost, family size and makeup, the family's resources, the type of the patient's study, and the family's needs. (*Id.* at 106a-07a, 109a-10a.) Ms. Fooks-Parker explained that "ideally we want something that is going to be homey for [the patients and their families], something where they have control over their environment, meaning they will have the opportunity to cook meals for their family, the opportunity to be in an area where they can go outside and kind of experience the community and so on." (*Id.* at 107a.) She has referred patients to Nick's House in the past for periods ranging from 6 weeks to 3 months. (*Id.* at 107a.) There have been times when she has attempted to secure housing at Nick's House for a patient but was unable to do so because Nick's House was occupied. (*Id.* at 108a.)

Headstrong also presented the testimony of Stephen Schuster, M.D., an oncologist at Penn Medicine, who specializes in blood cancers, specifically lymphoma. (*Id.* at 112a.) Dr. Schuster testified that he "treats patients from all over the country[,] . . . Europe, Asia, [and the] Middle East." (*Id.*) His patients come to the Philadelphia area for treatment because they cannot get the treatment that they

7

need where they live. (*Id.*) He has referred his out-of-town patients that have needed to stay in the area for more than a week or two to Nick's House. (*Id.* at 113a-15a.) He would endorse the expansion of Nick's House because there have been times when he has attempted to secure housing for a patient at Nick's House but was unable to do so because Nick's House was full. (*Id.* at 116a.)

Headstrong also presented the testimony of Donald Coneen, a licensed architect and home improvement contractor. (*Id.* at 117a.) Mr. Coneen testified that he and his team have conducted an informal feasibility analysis to determine what renovations his company would need to perform so that the Property would meet Headstrong's needs. (*Id.* at 119a, 129a-30a.) Those renovations, which are mainly focused on making the Property more handicapped accessible, include the installation of: (1) a third bathroom that is handicapped accessible; (2) a parking area that is compliant with the Americans with Disabilities Act of 1990 (ADA);[4] (3) a platform lift from the ADA-compliant parking area to the outside porch to create an accessible pathway from the parking area into the house; (4) an interior staircase chair lift from the first to second floor; (5) a second laundry area; and (6) an air conditioning upgrade. (*Id.* at 119a-26a.) Mr. Coneen does not expect to perform any major structural renovations, because Headstrong is "very concerned [with] maintaining the characteristic and the integrity of the building." (*Id.* at 126a.) Mr. Coneen explained that all of the intended renovations are consistent with a single-family home. (*Id.* at 126a-27a.) Mr. Coneen also explained that the Property has been maintained over the years and the intent is "to maintain the character of the site and the home." (*Id.* at 127a.)

---

[4] 42 U.S.C. §§ 12101-12213.

Headstrong also presented the testimony of Michael Peters, Esquire, a licensed architect and a practicing attorney, who is a member of the Borough's Zoning Hearing Board (ZHB). (*Id.* at 136a.) Mr. Peters testified that he served as the primary caregiver for a friend who had been diagnosed with acute lymphoblastic leukemia and spent the summer of 2013 in a hotel in Indianapolis while his friend sought treatment. (*Id.* at 137a-38a.) He would have preferred to stay in a setting like Nick's House because living in a hotel "was not a fantastic way to try and recover from a bad situation." (*Id.* at 138a.) Mr. Peters indicated that given his experience with and knowledge of the Ordinance as it relates to zoning, Headstrong's proposed use for the Property is not inconsistent with the character of the RB District, "particularly the edge of the RB District," where the Property is located. (*Id.* at 139a-40a.) Mr. Peters explained:

> [I]t's residential. The only thing that's nonconforming is the fact that the individuals are not related by marriage or blood, but in terms of the use and the character of the use it's very consistent with what you would see of a family. It's a [7]-bedroom house. So any family, single family, that lived in that house would be pretty big. They [sic] would have a lot of cars. They [sic] would have probably kids in the range of ages and multiple adults.

(*Id.* at 139a.)

Headstrong also presented the testimony of John Patro, the owner of Crown Security Systems. (*Id.* at 145a.) Mr. Patro testified that he performed a preliminary assessment of the Property for security and fire safety purposes. (*Id.* at 146a.) Based on that assessment, he recommended that Headstrong install a life safety fire alarm and a smoke detection and carbon monoxide system to protect the Property and its residents. (*Id.* at 146a-47a.) Mr. Patro explained that these systems are typical to

what he would install in any type of residential home, including a single-family home. (*Id.* at 146a-47a.)

Headstrong also presented the testimony of Perri Evanson, an associate broker at Berkshire Hathaway Home Services, who has been working in the Swarthmore real estate market for 20 years. (*Id.* at 150a-51a.) Ms. Evanson testified that the property located at 718 Harvard Avenue, which is directly adjacent to the Property, was on and off the market for 4 years before it sold for $528,270. (*Id.* at 152a.) Ms. Evanson opined that the sales price was very low, which she attributed to the impact of the church parking lot and Chester Road. (*Id.* at 152a-53a.) Ms. Evanson does not believe that the Accommodation Request would have an adverse impact on the value of the Property, which has been on and off the market for about 3 years. (*Id.* at 153a, 159a-60a.) She explained:

> I've lived in many properties in the area that are large and it is extremely difficult to find a family that's not blended to fit into a property like this, especially with [7] bedrooms. It's one of the reasons why these houses are on the market for so long, and why their value goes [sic] down, because there is not an accommodation for more than just husband, wife and a couple of kids.

(*Id.* at 153a-54a.) Ms. Evanson also does not believe that the sale of the Property would have a detrimental impact on property values in the area if the Property was sold for $699,927, the price identified on Headstrong's agreement of sale. (*Id.* at 154a-57a.) She explained:

> I believe that keeping houses on the market for a long time is one of the worst things that you can do for real estate. Values go down significantly, especially if you go after it. You get into years and years of a property being on the market, especially a property when it's in [sic] a busy street. You really run into trouble with the stability of the actual area itself . . . .
>
> . . . .

> . . . . So I do believe the faster that you can sell a property the better. The faster that house is not vacant, the better, and that if you put a viable living family, no matter how you, whatever your definition of family is, into a property, it will help stabilize that area as far as real estate is concerned.

(*Id.* at 156a-57a.)

Headstrong also presented the testimony of Robert Smythe, a resident of the neighborhood in which the Property is located. (*Id.* at 161a-62a.) Mr. Smythe does not believe that the proposed use of the Property would change the character of the neighborhood. (*Id.* at 162a.) Mr. Smythe explained that the neighborhood does not have "a single set of characteristics" and "contains many different uses already." (*Id.* at 163a.) Mr. Smythe also does not believe that the Property's residents would pose any greater threat or safety concern than anyone else who enters the neighborhood. (*Id.* at 164a.)

In opposition to Headstrong's Accommodation Request, Appellants presented the testimony of Joseph Kujawski, who previously resided at the Property for a period of approximately 2 years. (*Id.* at 171a.) Mr. Kujawski provided a description of the Property's interior and exterior features. (*Id.* at 172a-79a.)

Appellants also presented the testimony of Appellant Lisa Feehery, who has lived 2 houses down from the Property on Harvard Avenue for the past 7 years. (*Id.* at 180a.) Ms. Feehery testified that her neighborhood consists of large and small single-family homes, historic houses, and tree-lined streets; the residents, who are long-term and stable, are involved in the community and hold regular neighborhood events. (*Id.* at 181a-83a.) She described the neighborhood as "hidden" and explained that because Harvard Avenue and Chester Road are busy streets, the residents use the rear of their homes for access. (*Id.* at 182a.) The character of the neighborhood is important to her, because she has a special needs child who wanders

11

the neighborhood, and she needs the "village," which she described as parents watching the neighborhood kids to make sure they are safe and behaving themselves, "to know him so that he can stay safe." (*Id.* at 187a-89a.) Ms. Feehery explained that, as a parent, there is no way that she will be able to get to know the Property's residents as neighbors so that she can ensure that her child is safe. (*Id.* at 188a-89a.) She is concerned about the character of the neighborhood because people invest in their homes and their community, and they should be able to know that the homes in their neighborhood will remain single-family homes and not be turned into hotels. (*Id.* at 189a.)

Ms. Feehery stated further that there are school bus stops "literally every few feet on Harvard [Avenue]" that transport children to and from the high school, the middle school, the elementary school, the Swarthmore Presbyterian Church, and the community center. (*Id.* at 194a-95a.) The children riding those school busses access Harvard Avenue from the shared driveway that is located behind the Property. (*Id.* at 194a-95a.) She does not believe that the requested accommodation would be compatible and/or in character with the other uses in the RB District. (*Id.* at 196a.) She explained that the intensity of the intended use of the Property far exceeds what anyone is currently doing with any single-family home in the neighborhood and throughout the Borough. (*Id.* at 196a-97a.) Ms. Feehery indicated further that the traffic generated by guests coming to the Property every 6 to 8 weeks is not consistent with the community. (*Id.* at 197a.) When asked if she had concerns about whether the accommodation would adversely affect the health and safety of the neighborhood, Ms. Feehery stated that no one would be living at the Property permanently; the residents and volunteers would be cycling through the Property and the neighbors would have no idea who the residents and volunteers are.

12

(*Id.* at 197a-98a.) Ms. Feehery believes that the influx of people and the volume of traffic is dangerous to the neighborhood. (*Id.* at 198a-99a.)

Appellants also presented the testimony of Appellant Lisa O'Brien, who has lived 3 houses down from the Property on Harvard Avenue for the past 25 years. (*Id.* at 203a.) Ms. O'Brien testified that Harvard Avenue is the dividing line between the RB District and the Institutional zoning district; on her side of the street, it is residential, and on the other side of the street, it is institutional. (*Id.* at 204a-07a.) The businesses located along Harvard Avenue create a lot of traffic. (*Id.* at 207a.) Harvard Avenue is so narrow that when vehicles are parked on the north side of the street, Harvard Avenue becomes a one-lane road and several periods of gridlock occur, because people traveling in one direction have to wait for traffic to clear from the other direction before they can proceed. (*Id.* at 208a-11a.) Ms. O'Brien believes that the intersection of Chester Road and Harvard Avenue is unsafe and one of the most dangerous intersections in the Borough. (*Id.* at 212a-17a.) She is concerned about Headstrong's intended use of the Property, because the Property's driveway is located in the middle of all these traffic issues, and additional vehicles at the Property will exacerbate the traffic problems that already exist. (*Id.* at 217a.) She also stated that the driveway at the back of the Property provides access to 3 homes located on Chester Road. (*Id.* at 218a, 227a-28a.) The Property serves as the cornerstone of the neighborhood and creates "a bulwark against the traffic and activity on Chester Road." (*Id.* at 219a.) If the Property is used as a residence for people who are changing on a regular basis and do not have a stake in the community, the Property will no longer serve as a safety net for the neighborhood. (*Id.*)

13

Appellants also presented the testimony of Jessica Harrington, who resides on Chester Road across the Swarthmore Presbyterian Church parking lot from the Property. (*Id.* at 232a-33a.) Ms. Harrington accesses her home using the shared driveway located behind the Property. (*Id.* at 234a.) She has an easement with the Swarthmore Presbyterian Church that permits her to use the shared drive. (*Id.*) Her concerns regarding Headstrong's intended use for the Property relate to parking. (*Id.* at 235a.) She explained that while the Property "owns [the] parking spaces on [the] shared driveway, [she believes that] the easement require[s] that there's a good faith that they do not use that parking on Sundays during events and major holidays. And so any overflow parking, we don't know where that would go." (*Id.* at 235a, 238a-39a.) She is also concerned because when the use of the Property is changed from a single-family home to a high-impact use, there will be additional vehicles using the shared driveway, and it will be difficult for the people living in the 3 homes that use the shared driveway as the only access to their homes to get in and out. (*Id.* at 235a-36a.) She was also concerned about safety due to the lack of oversight "into how many actual cars end up coming to the house, how many visitors actually come to the house, and the enforcement of the rules that were presented to a patient." (*Id.* at 236a-37a.)

Appellants also presented the testimony of Patrick McFadden, a registered architect with expertise in municipal plan review. (*Id.* at 240a-42a.) Mr. McFadden opined that Headstrong's intended use of the Property "is clearly a change of use from RB residential single family to a normal, quotable, business zone . . . for transient lodging which could be accommodated elsewhere within the [B]orough limits." (*Id.* at 245a, 258a.) Mr. McFadden testified that the only parking plan that he had available to review was the property plan prepared by H. Gilroy Damon

Associates, Inc., which shows "parking spaces and comments on the number of parking spaces." (*Id.* at 244a, 246a.) There are several issues with the parking spaces delineated on the property plan: (1) 3 of the parking spaces are located within the driveway, which cannot be used for parking because it is a single lane; (2) 3 of the parking spaces are located in the garage and the middle bay door is so narrow that it is doubtful that 3 vehicles will fit inside the garage; and (3) 5 of the parking spaces are located along the common drive, which at least on Sundays are to be reserved for the Swarthmore Presbyterian Church. (*Id.* at 246a-47a.) Mr. McFadden also testified that the parking spaces are delineated using only the existing stone driveway and parking area, and, therefore, the parking area is not adequate to meet circulation and turnaround requirements. (*Id.* at 247a.)

Mr. McFadden stated further that the Uniform Construction Code,[5] which has been adopted in Pennsylvania, requires that 60% of all exits be accessible to comply with the ADA, and the property plan for the Property does not show any such accessibility. (*Id.* at 247a-49a.) He admitted, nevertheless, that this requirement does not apply to single-family homes. (*Id.* at 253a.) Mr. McFadden also indicated that, based on the building code classification for the Property's intended use, Headstrong may be required to install a fire sprinkler system, enclose the stair towers, and make the entire building, especially the bedrooms on the third floor, handicapped accessible.[6] (*Id.* at 249a-51a.) He believes that even with the accommodation, the Property's intended use would still be in violation of the

---

[5] 34 Pa. Code §§ 401.1-405.42.

[6] Mr. McFadden appeared to incorrectly assume that just because the patients would qualify as handicapped under the FHAA, they would all require accessible facilities. (R.R. at 251a, 256a-57a.)

15

Ordinance's definition of "single family" and would trigger a different use and occupancy under the building code. (*Id.* at 253a-56a.)

In rebuttal, Headstrong presented the testimony of David P. Damon, PE, PLS, whose company prepared the property plan that Mr. McFadden referenced during his testimony. (*Id.* at 267a.) Mr. Damon testified that while Headstrong could modify the narrow center door of the garage to make the garage more accessible, the garage is "certainly wide enough to fit the [B]orough's code requirement for size of parking spaces and it's usable for [3] cars." (*Id.* at 268a-69a.) He testified further that it is possible to add 3 parking spaces, 1 of which will be handicapped, in the area immediately adjacent to the house. (*Id.* at 269a-70a.) He explained that with the removal of some shrubbery, it is also possible to add an additional parking space adjacent to the church property. (*Id.* at 270a.) While it would be tight, vehicles would be able to back in and out of all of these parking spaces. (*Id.*) He concluded that in addition to the 5 parking spaces that are within the shared common drive, there is enough room on the Property for 10 off-street parking spaces. (*Id.* at 270a-71a.) The revision to the property plan showing parking was just something that Mr. Damon sketched to show how many parking spaces were available at the Property. (*Id.* at 272a-73a.) Both of the proposed parking plans that he prepared for the Property comply with the Ordinance's parking requirements.[7] (*Id.* at 273a-74a.)

---

[7] Following the testimony of Appellants' witnesses, Borough Council opened the hearing up to public comment, during which time several individuals offered support and opposition to Headstrong's Accommodation Request. (R.R. at 276a-81a.)

16

On December 20, 2016, Borough Council rendered its decision, approving Headstrong's Accommodation Request, subject to certain enumerated conditions.[8] In so doing, Borough Council made the following relevant findings of fact:

> 9. The cancer patients who will reside at the Property come from across the United States and foreign countries come [sic] to the Philadelphia area to obtain medical treatments that are not available where such patients reside.
>
> 10. Dr. [Stephen] Schuster, professor of medicine and [an] oncologist specializing in blood cancers, testified that some cancer patients require "prolonged" residency of "more than a week or two," near their hospital of treatment, and that "those patients we ask to keep close to the hospital" for treatments such as radiation therapy or daily infusion therapy, and that such patients' residency is "best in that kind of environment" to be offered by [Headstrong] rather than in a hotel. The communal family setting afforded by the single-family home provides significant emotional benefits for the cancer patients.
>
> 11. There is a need for an increase in the amount of long-term housing available to cancer patients. Nick's House is often full and unable to take on additional patients.
>
> 12. [Headstrong] will have one (1) or two (2) employees working at the Property from time to time. When fully occupied, residents and employees may park up to sixteen (16) vehicles on the Property at a time; more regularly, the number of vehicles to be parked on the Property would be in the range of seven (7) to ten (10).
>
> 13. [Headstrong] intends to install eighteen (18) on-site parking spaces on the site, [Headstrong] provided a drawing . . . demonstrating that

---

[8] Sometime after it rendered its December 20, 2016 decision, Borough Council issued undated findings of fact and conclusions of law in support thereof. All further references to Borough Council's decision shall be considered to be references to the undated findings and conclusions.

eighteen (18) parking spaces can be installed on the Property, and issuance of a certificate of occupancy is conditioned upon [Headstrong] submitting a professional parking plan for on-site parking spaces.

14. In the five years that Nick's House has been in operation in Ridley Township, there has not been any call for emergency services at the property.

15. The Property is a large single[-]family stone dwelling that includes [seven (7)] bedrooms, [two (2)] full baths, [one (1)] half bath; [Headstrong] does not propose any alterations other than accessibility alterations that would be visible from the exterior, and [Headstrong] intends to "maintain the character of the site and of the home."

16. [Headstrong] will not require municipal services at the Property in excess of those provided to other properties in the Borough, such as trash removal.

17. The Property is located in the southwest corner of the intersection of Pennsylvania State Route 320 (S. Chester Road) and Harvard Avenue (the "Intersection"), at the northeast corner of the [RB District]. The street on which the Property is located is the boundary between the [RB District] and the IN-A Industrial District. The neighborhood in which the Property is located is a transitional area among different zoning districts that provide for institutional[] and residential uses. The block at the northeast corner of the Intersection is zoned RC Residential, which allows for semi-detached dwellings, and AR Apartment Residential, which allows for multi-family dwellings and contains an apartment building.

18. The property immediately to the south of the Property is zoned RB residential but is vacant and is owned by the Swarthmore Presbyterian Church and is used as a parking lot.

19. The Property has been owned at different times in the past by the Swarthmore College, when it was used for offices, and by the Swarthmore Presbyterian Church[,] when it was used for a variety of church purposes including as a nursery school.

18

20. S. Chester Road is a busy north-south state road that was recorded as having over 11,000 trips per day in a traffic study conducted in 2013. The increase in traffic that will result from the requested accommodation will not be materially different from traffic that would result for use of the Property for a single family, as defined [by] the [Ordinance] . . . and the traffic generated from the Property would not be highly peaked during rush-hours.

21. The proposed use permitted by the [a]ccommodation may stabilize the housing prices after the recent sale of the neighboring property for a very low price, well below the price that [Headstrong] is proposing to pay under its agreement of sale [for] the Property. The presence of seven (7) bedrooms on the Property limits the demand for the Property, and has resulted in the Property remaining on the market for an extended period of time, which may adversely affect property values. Sale of the Property to [Headstrong] would not have an adverse impact on property values in the neighborhood; allowing it to remain on the market for an extended period of time may adversely affect property values.

22. "In terms of the use the character of the use" [sic] the [a]ccommodation will be "very consistent with what you would see of a family." Since the residence on the Property has seven (7) bedrooms, in all probability only a large family would reside therein, which may result in the parking of a large number of vehicles parked on or near the Property.

(Borough Council Decision at 1-3 (citations omitted); R.R. at 286a-88a.) Based on those findings of fact, Borough Council made the following relevant conclusions of law:

34. The cancer patients that [Headstrong] seeks to house at the Property are handicapped within the meaning of the [FHAA]. The Property is a single-family home that meets the requirements of [Headstrong] and enables it to provide cost[-]effective[,] supportive housing in a manner that [is] recognized as being beneficial to the patients. The communal family setting afforded by the single-family home provides significant benefits for the patient and their [sic] family member or partner who is

19

serving as a caregiver. Without the [a]ccommodation that relaxes the definition of "single-family" for purposes of the [RB District] to include up to seven [(7)] unrelated cancer patients and their caregivers, the cancer patients cannot use and enjoy a supportive communal dwelling in a quiet suburban single[-]family residential neighborhood while they are undergoing treatment at area cancer treatment centers. Accordingly, the [a]ccommodation is necessary within the meaning of the [FHAA] and [Ordinance] Section 1298.

35. The definition of a "family" for purposes of restricting occupancy in a particular zoning district, is subject to accommodation when that definition is limited only by the number of "unrelated" persons and that is particularly open to accommodation when the definition of family contemplates some additional number of persons unrelated by blood or legal family relationships.

36. Under the [FHAA], a municipality must provide a reasonable accommodation for handicapped persons to enjoy a dwelling. The determination as to what is "reasonable" is highly fact specific.

37. The Borough, in [Ordinance] Section 1298.07, has set forth the criteria for determining whether the requested accommodation is reasonable.

38. [Headstrong] has met the burden under the [FHAA] and [Ordinance] Section 1298.07 that the [a]ccommodation is reasonable by demonstrating:

    (a) the [a]ccommodation will not result in an undue financial or administrative hardship upon the Borough . . . ;

    (b) the [a]ccommodation does not undermine the purpose of the Zoning and Planning Code or the procedure with regard to which [Headstrong] is requesting an [a]ccommodation insofar as the proposed use is a residential use in an [RB District], and the exterior traditional appearance of the residence will not be altered;

    (c) the [a]ccommodation does not alter the use of the Property for residential purposes or render the Property incompatible with the other uses

20

in the [RB District] and is less intensive than other uses in immediate proximity to the Property;

(d) the [a]ccommodation will not create parking problems in the neighborhood because the parking needs will not be materially different from the parking needs of a large family;

(e) the [a]ccommodation will not result in any material increase in traffic on already heavily travelled roads bordering the [P]roperty and may mitigate trips during high traffic volume periods because the cancer patients and their caregivers will be less likely that [sic] residential occupants going to school and work would be to exit or enter the [P]roperty during peak traffic hours;

(f) the [a]ccommodation will further the health and welfare of the occupants of the Property and will not adversely affect the health and safety of the public;

(g) the conditions of the [a]ccommodation insure that the Property will be operated and maintained in a manner consistent with the safety requirements of the Borough and the building code requirements of the Borough with any special accommodations;

(h) the [a]ccommodation will not adversely affect property values in a manner unrelated to the presence of persons qualifying as "handicapped" under the [FHAA] as the only accommodation requested is with respect to whether the persons residing in the house are related; in fact, sale of the Property to [Headstrong] may stabilize property values in the neighborhood;

(i) the proposed use which is the subject of the [a]ccommodation is not subject to any licensure requirements in connection with the ownership, leasing, construction or operation of the Property; [and]

(j) the [a]ccommodation does not undermine the zoning and land use component of the Borough's comprehensive plan—there will be no

21

external changes in the appearance of the traditional residence located on the Property.

. . . .

40. Having established that the residents of the Property are "handicapped" within the meaning of the [FHAA], that the [a]ccommodation is necessary to enable the handicapped persons to enjoy the benefits of the dwelling in an environment most suited to furthering their health and safety and that the [a]ccommodation is reasonable, the burden shifts to the Appellants to demonstrate that the [a]ccommodation is not reasonable.

41. Assuming, *arguendo*, that Appellants have demonstrated that the [a]ccommodation may occasionally result in parking on the Property in excess of that which a single[ ]family might produce, Appellants have not demonstrated that such increase in parking rises to the level of rendering the [a]ccommodation unreasonable. Any finding that a requested accommodation is unreasonable must be based on the record and not merely on the expression of fears by the neighbors of a [p]roperty subject to an accommodation request.

(Borough Council Decision at 5-7 (citations omitted); R.R. at 290a-92a.) Appellants appealed Borough Council's decision to Common Pleas, which affirmed the decision. This appeal followed.

## II. ISSUES ON APPEAL

On appeal to this Court,[9] Appellants raise the following issues for our consideration: (1) whether Borough Council committed an error of law by

---

[9] This Court's "review in land use appeals where the trial court takes no additional evidence is limited to determining whether the [local governmental body] committed an error of law or abused its discretion. *Galzerano v. Zoning Hearing Bd. of Tullytown Borough*, 92 A.3d 891, 894 (Pa. Cmwlth. 2014). "A [local governmental body] abuses its discretion if its findings are not supported by substantial evidence." *Arter v. Phila. Zoning Bd. of Adjustment*, 916 A.2d 1222, 1226 n.9 (Pa. Cmwlth.), *appeal denied*, 934 A.2d 75 (Pa. 2007). "Substantial evidence is such relevant evidence as a reasonable mind might consider as adequate to support a conclusion." *Id.*

determining that Headstrong was entitled to an accommodation under the Ordinance and the FHAA;[10] (2) whether Borough Council committed an error of law by determining that Headstrong intends to use the Property as a "dwelling"; (3) whether Borough Council committed an error of law by failing to set forth its credibility determinations in its decision and by wholly disregarding the entirety of the evidence presented by Appellants; and (4) whether Borough Council's findings of fact in support of its decision to grant the Accommodation Request are supported by substantial evidence.

## III.  DISCUSSION

### A.  Legal Standard

Section 3604(f)(1) of the FHAA, 42 U.S.C. § 3604(f)(1), *inter alia*, makes it unlawful to discriminate in the sale of a dwelling or otherwise make a dwelling unavailable to a buyer because of that buyer's handicap or the handicap of persons associated with that buyer.  Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  Section 3604(f)(3)(B) of the FHAA, 42 U.S.C. § 3604(f)(3)(B).  Thus, Section 3604(f)(3)(B) of the FHAA requires that an accommodation be granted when it is reasonable and necessary to afford handicapped persons an equal opportunity to use and enjoy housing.  *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch Plains*, 284 F.3d 442, 457

---

[10] In addition to the Ordinance and the FHAA, Appellants also identify the ADA and suggest that Borough Council committed an error of law by determining that Headstrong was entitled to an accommodation under the ADA.  Appellants, however, have failed to develop any argument with respect to the ADA, and, therefore, we will not address the ADA any further in this opinion.  *See* Pa. R.A.P. 2119(a); *Rapid Pallet v. Unemployment Comp. Bd. of Review*, 707 A.2d 636, 638 (Pa. Cmwlth. 1998).

(3d Cir. 2002). Discrimination challenges for failure to make reasonable accommodations under the FHAA are analyzed using the burden-shifting framework developed by the Third Circuit in *Lapid-Laurel*: "the plaintiff bears the initial burden of showing that the requested accommodation is necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling, at which point the burden shifts to the defendant to show that the requested accommodation is unreasonable." *Lapid-Laurel*, 284 F.3d at 457.

The Borough exercised its police power and legislatively established a formal procedure that persons covered by the FHAA may use to request a reasonable accommodation to its Ordinance. *See* Chapter 1298 of the Ordinance. An applicant seeking to utilize such procedure must file a fair housing accommodation request with the Borough. In rendering a decision on an application for accommodation under the FHAA, the Review Board—and subsequently Borough Council if the Review Board's decision is appealed—must take into consideration the following criteria, if applicable:

> (a) Whether the requested accommodation is necessary to afford a person "handicapped" within the meaning of the [FHAA] equal opportunity to use and enjoy a dwelling.
>
> (b) Whether the requested accommodation would impose an undue financial or administrative hardship upon the Borough.
>
> (c) Whether the requested accommodation would undermine the purpose of this chapter or procedure with regard to which the applicant is requesting an accommodation.
>
> (d) Whether the requested accommodation would be compatible and/or in character with other uses in the particular zoning district.
>
> (e) Whether the requested accommodation would adversely affect traffic and/or parking issues.

24

(f) Whether the requested accommodation would adversely affect the health and/or safety of the occupants or the public.

(g) Whether the requested accommodation would adversely affect property values in a manner unrelated to the presence of persons qualifying as "handicapped" under the FHAA.

(h) Whether the applicant has complied with any applicable licensure or other governmental requirements in connection with the ownership, leasing, construction, or operation regarding which the accommodation is sought.

(i) Whether the requested accommodation would undermine the zoning and land use component of the Borough's comprehensive plan.

(j) Whether, if the applicant has requested a reasonable accommodation to the Building Code that implicates a safety concern, the applicant has adequately explained how it intends to satisfy the safety concern underlying the provision to which the applicant seeks an accommodation.

Section 1298.07 of the Ordinance. Section 1298.07(a) of the Ordinance represents the first prong of the *Lapid-Laurel* burden-shifting framework. Section 1298.07(b)-(j) of the Ordinance represents the second prong of the *Lapid-Laurel* burden-shifting framework and identifies those factors that Borough Council must consider in determining whether the requested accommodation is reasonable, *i.e.*, the reasonableness factors.

### B. Whether Headstrong was Entitled to an Accommodation Under the Ordinance and the FHAA

Appellants argue that Borough Council committed an error of law by determining that Headstrong was entitled to an accommodation under the Ordinance and the FHAA, because Headstrong failed to establish that the accommodation is necessary to afford a handicapped individual an equal opportunity to use and enjoy the Property. More specifically, Appellants contend that the approval of the

25

Accommodation Request would provide handicapped individuals with an opportunity beyond what non-handicapped persons could enjoy, because 14 unrelated non-handicapped individuals cannot live at the Property under the Ordinance. In response, Headstrong argues that "the fact that the [a]ccommodation gives handicapped individuals an opportunity that non-handicapped individuals do not enjoy . . . is precisely why it is an accommodation[,]" and the "[a]ccommodation is necessary to provide cancer patients with both the comforts of a home and a support network of other cancer patients and their caregivers." (Headstrong's Br. at 22-23.)

This case is not your typical FHAA discrimination case, where handicapped individuals allege that a local municipality's zoning ordinance is facially discriminatory or is being applied in a discriminatory manner against handicapped individuals, or that the local municipality has failed to provide handicapped individuals with a reasonable accommodation. Rather, this case involves an appeal from a local municipality's decision to grant an accommodation request pursuant to a legislatively defined procedure, whereby handicapped individuals can apply to the local municipality for an accommodation under the FHAA. Headstrong filed its Accommodation Request pursuant to Chapter 1298 of the Ordinance, seeking an accommodation under the FHAA to revise the Ordinance's definition of "family" to permit it to use the Property, a single-family dwelling located in the RB District, as a long-term housing facility for "up to [7] unrelated cancer patients and their caregivers." (R.R. at 397a.) In connection with its Accommodation Request, Headstrong was only required to establish that the accommodation is necessary to afford the cancer patients an equal opportunity to use and enjoy the Property. *See* Section 1298.07(a) of the Ordinance; *Lapid-Laurel*, 284 F.3d at 457.

26

Headstrong was not required to establish that the Ordinance's definition of "family" is discriminatory against cancer patients. Thus, Appellants' discrimination-based argument—*i.e.*, that the accommodation is not necessary to afford a handicapped individual an equal opportunity to use and enjoy the Property because it provides handicapped individuals with an opportunity beyond what is available to non-handicapped individuals—is misplaced. In addition, Appellants have not challenged Borough Council's finding with respect to the cancer patients' need for the requested accommodation. As a result, Borough Council's finding of need/necessity is dispositive. For these reasons, we cannot conclude, based upon the issues presented to us on appeal, that Borough Council committed an error of law by determining that the Accommodation Request is necessary to afford the cancer patients an equal opportunity to use and enjoy the Property.[11]

Appellants also argue that Borough Council committed an error of law by determining that Headstrong was entitled to an accommodation under the Ordinance and the FHAA because Headstrong failed to establish that the accommodation is reasonable. More specifically, Appellants contend that Headstrong failed to demonstrate that the accommodation: (1) will not adversely affect traffic and

---

[11] We emphasize that we have made no decision relative to whether the requested accommodation—*i.e.*, increase of the single-family dwelling unrelated persons cap from the 3 permitted by the Ordinance to 7 cancer patients plus caregivers (up to 14 unrelated)—is necessary to afford cancer patients an equal opportunity to use and enjoy the Property. From our review of the record, we are dubious of whether Headstrong met its burden on this question. Nonetheless, that question is not before the Court. In their brief to the trial court, Appellants argued that the record does not contain substantial evidence to support Borough Council's finding that the accommodation is necessary for cancer patients to have a supportive communal dwelling. Appellants, however, appear to have abandoned that line of argument on appeal to this Court, because they did not develop it in their brief. Instead, Appellants' argument, which we address above, focuses on the contention that the Ordinance does not present an inequity that must be addressed by the FHAA, because 14 unrelated non-handicapped individuals also cannot live at the Property.

parking; and (2) is compatible and/or in character with the other uses in the RB District—*i.e.*, that the use of the Property for transient lodging does not fundamentally alter the existing residential quality of the neighborhood. In response, Headstrong argues that once it established that the accommodation was necessary to afford the cancer patients an equal opportunity to use and enjoy the Property, the burden shifted to Appellants to demonstrate that the accommodation was unreasonable. Headstrong argues that Appellants failed to meet their burden of proving that the accommodation is unreasonable.

Under the *Lapid-Laurel* burden-shifting framework, once Headstrong established that the accommodation is necessary to afford cancer patients an equal opportunity to use and enjoy the Property, the burden shifted to Appellants to demonstrate that the accommodation was unreasonable. *Lapid-Laurel*, 284 F.3d at 457. Thus, any burden relating to the accommodation's effect on traffic and parking and compatibility with other uses in the RB District was on Appellants, not Headstrong.

Appellants seem to confuse the standard that the ZHB must apply to an application for a use variance with the standard that Borough Council must apply to an accommodation request under the FHAA. In the context of a use variance, Section 910.2 of the Pennsylvania Municipalities Planning Code (MPC)[12] requires the ZHB to, where applicable, make specific findings relative to all of the required elements before it may grant a variance, including, but not limited to, "[t]hat the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the

_____

[12] Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10910.2.

28

appropriate use or development of adjacent property, nor be detrimental to the public welfare." In the context of an accommodation request, however, Section 1298.07 of the Ordinance simply requires Borough Council to consider all of the reasonableness factors set forth therein. Put more simply, the standard for a use variance contains elements, all of which must be affirmatively established, whereas the standard for an accommodation request under Section 1298.07 of the Ordinance contains factors, all of which must be considered but not necessarily affirmatively established.

Our review of Borough Council's decision reveals that Borough Council considered all of the reasonableness factors set forth in Section 1298.07 of the Ordinance in reaching its decision. Borough Council made specific findings with respect to each of the reasonableness factors and specifically discussed those factors that had particular areas of concern—*i.e.*, parking and traffic, impact on property values, character of the Property's intended use, and consistency of the Property's intended use with other uses in the RB District. (*See* Borough Council's Decision at 2-3, 6-7; R.R. at 287a-88a, 291a-92a.) As a result, we cannot conclude that Borough Council committed an error of law by determining that the accommodation was reasonable.

### C. Whether Headstrong Intends to Use the Property as a "Dwelling"

Appellants argue that Borough Council committed an error of law by determining that Headstrong intends to use the Property as a "dwelling." More specifically, Appellants contend that Headstrong intends to use the Property not as a dwelling but merely "as a temporary sojourn, limited to the time needed for the patient's treatment in the Philadelphia area." (Appellants' Br. at 17.) In response, Headstrong argues that its intended use of the Property meets the requirements for a "dwelling" under both the Ordinance and the FHAA. Headstrong argues further that

the "Ordinance does not include any durational requirement and, moreover, [Borough Council] has taken the position that bed and breakfasts, which house guests for shorter durations than [its intended] use, are 'dwellings' and permitted in the [RB District.]" (Headstrong's Br. at 38.) Headstrong also argues that "[t]he duration and character of the residents' stay at the [Property] support a finding that [Headstrong's intended] use of the [Property] constitutes more than merely temporary sojourns or transient visits and, therefore, satisfies the definition of 'dwelling' under the FHAA." (Headstrong's Br. at 42.) Similarly, Borough Council argues that the plain language of the Ordinance's definition of "dwelling" contains no minimum duration of stay, but rather, contemplates that a family will use its dwelling for habitation by boarders, roomers, or lodgers, as those terms are included in the Ordinance's definition of "family."[13] Borough Council argues further that its "interpretation of the Ordinance . . . is entitled to great weight and deference," and, even assuming the Ordinance was ambiguous, Borough Council "was required to interpret the Ordinance to allow the least restrictive use of the [Property,]" which would include a finding that the Ordinance's definition of "dwelling" does not "rely on the length of the resident's stay where it specifically contemplates 'boarders, roomers or lodgers.'" (Borough Council's Br. at 12-13.)

Section 1240.05(36) of the Ordinance defines "dwelling" as "a building or portion of a building used for human habitation by a family." Appellants have not cited and we have not found any provision in the Ordinance that limits habitation by duration or permanency. In fact, Borough Council has recently permitted Borough

---

[13] Section 1240.05(43) of the Ordinance defines "family" as: "(a) A single person occupying a dwelling unit; (b) Two or more persons related by blood or marriage occupying a dwelling unit, plus not more than two boarders, two roomers or two lodgers; or (c) Not more than three unrelated persons occupying a dwelling unit, living together."

30

residents to operate bed and breakfast establishments at their single-family homes in the RB District, provided that such residents do not violate the 3-unrelated persons rule established by the Ordinance's definition of "family." (R.R. at 94a.) With the accommodation revising the Ordinance's definition of "family" to include 7 unrelated cancer patients and their caregivers, Headstrong will be using the Property for habitation by a family, thus meeting the definition of "dwelling" under Section 1240.05(36) of the Ordinance. For these reasons, we cannot conclude that Borough Council committed an error of law by determining that Headstrong intends to use the Property as a "dwelling."

**D. Whether Borough Council Erred by Failing to Set Forth its Credibility Determinations and by Wholly Disregarding Appellants' Evidence**

Appellants argue that Borough Council committed an error of law by failing to set forth its credibility determinations in its decision and by wholly disregarding the entirety of the evidence presented by Appellants. In response, Borough Council argues that its decision should be affirmed because it properly weighed the evidence presented by the parties and concluded that Headstrong met its burden of proof.

It is clear from our review of Borough Council's decision that Borough Council considered Appellants' evidence. In fact, Borough Council placed a condition on its approval of Headstrong's Accommodation Request that specifically addressed Appellants' concerns about parking at the Property. (R.R. at 284a ("[Headstrong] agrees to provide [Borough Council] for its review and approval a professional parking plan to accommodate the use and needs created by the accommodation.").) Furthermore, Borough Council was not required to set forth its credibility determinations in its decision, so long as its credibility determinations were clear from its findings/conclusions. *See, e.g.*, *Fisler v. State Sys. of Higher Educ., Cal. Univ. of Pa.*, 78 A.3d 30, 43 (Pa. Cmwlth. 2013) (citing *Forest Area Sch.*

31

*Dist. v. Shoup*, 621 A.2d 1121, 1124 (Pa. Cmwlth. 1993)). Upon review of the record, it is evident to this Court which testimony Borough Council credited and which testimony Borough Council rejected. For these reasons, we cannot conclude that Borough Council committed an error of law by failing to set forth its credibility determinations in its decision and by wholly disregarding the entirety of the evidence presented by Appellants.

### E. Whether Borough Council's Decision is Supported by Substantial Evidence

Appellants argue that the "majority" of Borough Council's findings of fact are not supported by substantial evidence. In support of their argument, however, Appellants cite to only one finding of fact—Finding of Fact No. 22, which provides:

> "In terms of the use the character of the use" [sic] the [a]ccommodation will be "very consistent with what you would see of a family." Since the residence on the Property has seven (7) bedrooms, in all probability only a large family would reside therein, which may result in the parking of a large number of vehicles parked on or near the Property.

(Borough Council Decision at 3 (citation omitted); R.R. at 288a.) Appellants contend that Finding of Fact No. 22 is not supported by substantial evidence because the patients are guests, not a family—*i.e.*, "all rooms are locked with key codes, all rooms have hotel-like safes, all guests must supply their own food and the general rules require all guests to treat the common areas similar to hotel lobbies." (Appellants' Br. at 19.) Appellants also contend that Finding of Fact No. 22 is further eroded by Appellants' unrefuted evidence establishing that the RB District is "family friendly" and that the average single-family home in the RB District is inhabited by an average of 2.55 people. (Appellants' Br. at 20.)

Borough Council's finding that the Accommodation Request will be consistent with a family and the other uses in the RB District is premised on the undisputed evidence regarding the number of bedrooms on the Property and the amount of vehicles that could be parked at the Property if all of those bedrooms are occupied by the members of the family who are residing at the Property. Mr. Peters, a member of the ZHB, testified that Headstrong's proposed use for the Property is consistent with the character of use in the RB District because any single family that would reside at the Property would be large and would have a number of vehicles parked thereon. (R.R. at 139a.) In addition, Appellants, who had the burden of proving that the accommodation is unreasonable, have not established how the character of the RB District is altered if the Property's bedrooms are locked with key codes and contain hotel-like safes and the Property's residents are required to supply their own food. Appellants have also not established that the accommodation will alter the "family-friendly" nature of the RB District. Appellants' concerns regarding the turnover in the Property's residents are just that—concerns that obviously did not sway Borough Council in making its decision. Furthermore, whether other single-family homes in the RB District are inhabited only by an average of 2.55 people is irrelevant, because, assuming that the Property's residents meet the definition of family under Section 1240.05(43) of the Ordinance, there is no limit on how many individuals can reside at the Property. For these reasons, we conclude that Borough Council's decision, specifically Finding of Fact No. 22, is supported by substantial evidence.

33

# IV.  CONCLUSION

Accordingly, we affirm Common Pleas' order.

_____
P. KEVIN BROBSON, Judge

President Judge Leavitt dissents.
Judge Fizzano Cannon concurs in the result only.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Anthony and Deborah Carunchio,    :
William and Lisa Feehery, Jim    :
Anderson, Mark and Lisa O'Brien,    :
Tam Heckel, John and Kay Coldiron,    :
and Joanna and Jarrod Barton,    :
                Appellants    :
    :
        v.    :    No. 1379 C.D. 2017
    :
Swarthmore Borough Council    :
and Headstrong Foundation    :

## **O R D E R**

AND NOW, this 11th day of August, 2020, the order of the Court of Common Pleas of Delaware County is hereby AFFIRMED.

P. KEVIN BROBSON, Judge